UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SLEEPMED INCORPORATED, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 15-cv-14041-IT |
| PULSE SYSTEMS, INC., | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

January 20, 2016

TALWANI, D.J.

Before the court is Plaintiff SleepMed Incorporated's ("SleepMed") Motion for Preliminary Injunction [#3]. SleepMed seeks an order directing Defendant Pulse Systems Inc. ("Pulse") to continue to provide software maintenance and support services that SleepMed contends Pulse is contractually obligated to provide and which Pulse has suggested it will no longer provide. As set forth below, after holding a hearing on the motion and receiving evidence, the court determines that SleepMed has not demonstrated an immediate threat of irreparable harm. The Motion for Preliminary Injunction [#3] is therefore DENIED without prejudice.

I.   Facts

SleepMed is the largest private sleep diagnostics provider in the country with facilities in 32 states. Verified Compl. ¶ 2; Rose Decl. [#5] ¶ 3. Pulse provides software applications for the health care industry. Verified Compl. ¶ 8. In June 2001, SleepMed and Pulse entered into an

"Information Services Agreement" ("2001 Agreement") wherein SleepMed purchased 50 "seat" licenses for Pulse's Pro Practice Management Platform software ("Practice Management Software"). Verified Compl. ¶ 18; id. Ex. A [#1-1] § II.3.1.[1]  In addition to these licenses, the 2001 Agreement provided for SleepMed to pay for and Pulse to provide maintenance of the Pulse Practice Management Software for at least five years. Verified Compl. Ex. A §§ II.3.1, II.4.2. After the expiration of the five year term, Pulse's software maintenance services would be automatically renewed for one year periods unless terminated by either party. Id. § II.4.2.

On or about February 27, 2012, SleepMed and Pulse executed a second "Information System Agreement" ("2012 Agreement") wherein SleepMed purchased an additional 12 "provider" licenses for Pulse's electronic health records software ("EHR Software"). Verified Compl. ¶ 25; id. Ex. B [#1-2] Schedule 2. The 2012 Agreement further provided for SleepMed to pay a "Simplicity Monthly Fee" which included the amortized cost of the EHR Software licenses and the cost of monthly EHR Software maintenance services. See Ex. A to Verified Compl. Ex. B.  In addition, the 2012 Agreement provided for SleepMed to pay a separate monthly fee for ongoing support and maintenance services for the previously purchased Pulse Practice Management Software. See Ex. A-2 to Verified Compl. Ex. B. Finally, the 2012 Agreement contained a dispute resolution provision entitling any party to seek equitable relief from a court of competent jurisdiction but requiring the parties to mediate any other dispute. See Verified Compl. Ex B § 13.2.

In 2014, Pulse sent SleepMed an invoice for $2,425,219 for alleged underpayments

---

[1] After Pulse conducted an audit of SleepMed's actual usage of the Pulse Practice Management Software in 2009, Pulse required SleepMed to purchase an additional 4 licenses. Verified Compl. ¶ 21.

2

dating back to 2001 ("2014 Invoice").  Verified Compl. ¶ 26.  SleepMed disputes owing this money and contends the 2014 Invoice is based on a billing method that is inconsistent with the parties' course of dealing and representations Pulse made to SleepMed.  Id. ¶¶ 28, 29.  SleepMed and Pulse commenced a mediation to resolve the dispute over the 2014 Invoice but the dispute remains unresolved.  Id. ¶ 30.

On November 23, 2015, a Pulse Accounting Assistant sent SleepMed an email advising SleepMed that Pulse had placed it "on Credit Hold due to non-payment on the account."  Id. ¶ 31.  By letter dated December 3, 2015, SleepMed sought assurance from Pulse that Pulse would continue to provide software maintenance and support as required under § 7 of the 2012 Agreement.  Id. ¶¶ 34, 36.  Pulse did not respond to SleepMed's letter.  Id. ¶ 36.  In a late-filed affidavit, Pulse's Senior Vice President Greg Vap responded that "Pulse is inclined not to provide additional support services to SleepMed" until the dispute regarding the 2014 Invoice is resolved given SleepMed's alleged material breach of the 2001 and 2012 Agreements in permitting unauthorized use of Pulse's software.  Vap Aff. [#20] ¶ 9.

At the preliminary injunction hearing held January 12, 2016, SleepMed Vice President of Finance and Administration Joseph Rose testified as to SleepMed's reliance on the Pulse Practice Management Software for managing its cash flow.  Tr. Prelim Inj. Hr'g [#24] at 34-38. In particular, Rose testified that SleepMed uses the software to manage billing and collections and to provide monthly "accounts receivable aging reports" to its bank in order to draw on an open line of credit.  Id. at 35:18-36:15.  Rose further testified that SleepMed's ability to pay its employees and vendors would be impacted if SleepMed's ability to draw on its line of credit were impaired.  Id. at 36:22-37:7.

In addition, SleepMed Systems Training Manager Rosemary Lewis testified as to

3

SleepMed's need for Pulse's software support and maintenance services. Id. at 44-53. Lewis testified that SleepMed employees have submitted 644 requests for support and/or maintenance services to Pulse in the last ten years, ten of which are currently still open. Id. at 45:11-46:4. Lewis further testified that Pulse has provided approximately 15 to 20 software upgrades to SleepMed, and that Pulse has released three upgrades in recent weeks that Pulse refused to provide to SleepMed due to SleepMed being on "credit hold." Id. 48:4-48:7; 48:11-48:15; 49:11-51:24. On cross-examination, Lewis testified that Pulse's failure to provide the three recent software updates has not caused SleepMed to lay off any employees or close any locations, nor has it prevented SleepMed from serving its patients. Id. at 53:9-53:20.

  II.  Discussion

A party seeking a preliminary injunction must show:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e. the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and, (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 17-18 (1st Cir. 2006) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)). The party seeking the injunction bears the burden of establishing that these factors weigh in its favor. Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).

A demonstration of a likelihood of irreparable harm, in particular, is a mandatory "prerequisite" to obtaining a preliminary injunction. Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (citing 11A Wright & Miller, Fed. Practice and Procedure § 2948.1, at 139 (2d ed. 1995) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted

the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.")).  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).  Indeed, the threat of harm and need for relief must be "immediate."  See Matos ex rel. Matos v. Clinton Sch. Dist., 367 F.3d 68, 74 (1st Cir. 2004) ("Absent something that indicates a need for *immediate* relief, a plaintiff's request for preliminary injunction ordinarily ought to be rejected.") (emphasis in original); McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001) (the irreparable harm prong requires a plaintiff to show "a significant potential for irreparable harm in the absence of immediate relief").

    Here, SleepMed has not demonstrated an immediate threat of irreparable harm if Pulse stops providing software maintenance and support services.  That SleepMed's ability to pay its employees and vendors could be impacted if it is not able to use Pulse's software to generate reports does not establish that the threat of SleepMed being unable to generate those reports absent Pulse's ongoing support and maintenance is a real and immediate one.  Though SleepMed's witnesses testified that SleepMed has used Pulse's software support hundreds of times in the last several years and that SleepMed relies on Pulse's software to manage its cash flow, SleepMed has made no showing that it is reasonably likely to experience a problem with Pulse's software in the immediate term that would actually impact SleepMed's ability to generate reports, let alone to do so to such a degree as to cause irreparable harm.  Therefore, SleepMed's concerns about the possible impact of Pulse discontinuing its maintenance and support services on SleepMed's ability to manage its cash flow are speculative and not sufficient to establish a need for a preliminary injunction at this time.  See Ross-Simons of Warwick, Inc.

v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). ("[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm.").

Because SleepMed has not made a sufficient showing of immediate threat of irreparable harm, the court need not reach the other factors in the preliminary injunction analysis. See Pub. Serv. Co. of N.H. v. Town of W. Newbury, 835 F.2d 380, 383 (1st Cir. 1987).  Accordingly, the court DENIES SleepMed's Motion for Preliminary Injunction [#3] without prejudice to SleepMed establishing an immediate threat of irreparable harm should the circumstances change.

IT IS SO ORDERED.

Date: January 20, 2016                                              /s/ Indira Talwani
                                                                    United States District Judge